UNITED STATES *v.* ROHNER GEHRIG & CO., INC.

**No. 4923.**—Invoice dated Baden, Switzerland, August 26, 1936.
Entered at New York September 9, 1936.
Entry No. 730556.

Third Division, Appellate Term

(Decided June 6, 1940)

*Webster J. Oliver*, Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the appellant.
*Brooks & Brooks* (*Frederick W. Brooks, Jr.*, of counsel) for the appellee.

Before CLINE, EVANS, and KEEFE, Judges

CLINE, Judge: This is an application to review a decision of the trial judge published in Reap. Dec. 4629. The merchandise covered by the appeal consists of one supercharging blower, type VT 201a,

No. B. 8628, manufactured and shipped by Brown, Boveri & Co., Ltd., of Baden, Switzerland, on August 26, 1936, to the McIntosh & Seymour Corp. of Auburn, N. Y. The invoice price of the article is 4,750 Swiss francs with an addition of 55 Swiss francs for packing, making a total value of 4,805 Swiss francs, and the machine was entered at that value. The United States appraiser added 1,525 Swiss francs to make export value, the total appraised value being 6,330 Swiss francs, packing included. The trial judge appraised the merchandise at the entered value and the Assistant Attorney General filed an application for review of that decision.

At the trial before the single judge, four exhibits were introduced in evidence. Exhibit 1 is an affidavit of Adolf Meyer, who is managing director of Brown, Boveri & Co., Ltd., the exporter of the merchandise. Exhibit 2 is an affidavit of Dr. Alfred J. Buchi of Winterthur, Switzerland, who is a consulting mechanical engineer. Exhibit 3 is an affidavit of Paul R. Sidler, a resident engineer in New York connected with Brown, Boveri & Co., Ltd., the exporter. This exhibit contains also a joint affidavit of Adolf Meyer and Dr. Alfred J. Buchi, who were the affiants in Exhibits 1 and 2. Exhibit 4 appears to be a memorandum of account between Brown, Boveri & Co., Ltd., and the McIntosh & Seymour Corporation. It is copied in full in the decision of the trial judge.

We have carefully examined these exhibits and deem it unnecessary to review them in detail as the trial judge stated in his decision substantially all the facts contained therein.

The sole point in issue is whether a charge of 1,525 Swiss francs, which the McIntosh & Seymour Corporation, the importer herein, agreed to pay to Dr. Alfred J. Buchi for his services as an engineer in advising the McIntosh & Seymour Corporation how to increase the power in Diesel engines, should be added to the value of a super charging blower manufactured by Brown, Boveri & Co., Ltd., of Baden, Switzerland, which blower was intended to be used in connection with an engine being built by the McIntosh & Seymour Corporation in the United States.

The parties agreed in open court, as stated by the trial judge in his decision, that "if the court held that the item of 1,525 Swiss francs was properly included in the market value, then the appraised value should be affirmed, but that if on the contrary, the said item should not be so included, then the entered value should be sustained."

To review the facts briefly, it is shown that the power in Diesel engines is increased from 20 to 30 per centum by the use of a supercharging blower in connection with the engine and that Dr. Alfred J. Buchi invented, and secured a patent therefor, a system by which the power in a Diesel engine may be increased by 40 to 45 per centum.

This system involves a change in the engine design and the use of a supercharging blower having the proper dimension or size. These changes in the engine design and the duties of Mr. Buchi are described in the affidavit of Paul R. Sidler in Exhibit 3 as follows:

This system of obtaining best results, as it is now developed, comprises definite changes to the cams of the Diesel engine, the dimensions and arrangements of the intake and exhaust piping, sometimes changes to the valves and always a rearrangement of the timing of the valves. These necessary modifications are determined after close study of the engine design. On the basis of this study Mr. Buchi writes out the new operating data for supercharged condition, gives guarantees for the expected improvement and furnishes to the Diesel builder, who desires his services, the drawings, diagrams and general engineering advice for making such modifications to his engine, as Mr. Buchi considers necessary for best results.

  &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;

Mr. Buchi's investigation also determines the volume and pressure of the supercharging air which is needed for best results and the volume, pressure and temperature of the exhaust gases emerging from the supercharged Diesel engine, which gases can be utilized in an exhaust-gas turbine to drive the supercharging blower.

The record shows further that Mr. Buchi had nothing to do with the designing of the supercharging blower such as is covered by the importation in this case. He merely recommends the type of blower to be used with the engine after the changes he suggests are made in the engine. The following appears in the affidavit of Mr. Sidler in Exhibit 3:

3) *Design of our supercharging units.*

This design was originally conceived by staff engineers of Brown, Boveri & Co., Ltd. in 1915 and has since been developed and perfected without any outside help. In particular Mr. Buchi has had no part in the perfection of this design. In the cases where Diesel builders contract for Mr. Buchi's services, he tells our company the volume and pressure of the air which the blower should supply and the volume, pressure and temperature of the exhaust gas available from the Diesel engine. These few data are needed to correctly dimension our supercharging unit for a given case.

The record shows further that Mr. Buchi's only office is in Winterthur, Switzerland, and, as Brown, Boveri & Co., Ltd. have representatives in other countries, Brown, Boveri & Co., Ltd. frequently make collections of Mr. Buchi's fees for him and pay such fees to him as soon as they are collected. This is shown in Exhibit 2, as follows:

In the majority of cases such Diesel builders find it to their advantage to engage my services and to buy the supercharging units from Brown, Boveri & Co., Ltd., and as I maintain a consulting engineering office in Winterthur without any branch offices or agents in other countries, Brown, Boveri & Co., Ltd., through their branch offices or representatives in foreign countries, frequently make collections of my fees from such Diesel builders with whom I have made arrangements for my services, merely as an accommodation to me, and pay over to me the said fees as soon as they have collected them for my account. In this manner my fee of Swiss Francs 1525 for engineering services rendered to the McIntosh & Seymour

Corp. of Auburn, New York, in 1936, was collected for my account by Brown, Boveri & Co., Ltd., and paid over to me, which practice has been followed in a number of other transactions in which I have rendered such engineering services to customers of Brown, Boveri & Co., Ltd., in the United States of America, which country I have visited several times during the past few years for the purpose of inspecting and superintending the application of my system of supercharging to the Diesel engines being built by my clients.

Counsel for the Government strenuously argued in open court before this division that the plans or blueprints showing changes to be made by McIntosh & Seymour Corp. in their engines accompanied the supercharging blower in this case and that accordingly the charges for Mr. Buchi's services should be added to the cost of the blower. We have examined the record carefully and find nothing to indicate that plans or blueprints prepared by Mr. Buchi were a part of the shipment in this case. Counsel for the importers argued that if Mr. Buchi made any plans or blueprints for changes in McIntosh & Seymour Corporation's engines, he transmitted them to the importer in another shipment. We note a reference to blueprints in the affidavit of Mr. Buchi in Exhibit 2, but the statement appears to refer to blueprints made by the engine builders in this country which Mr. Buchi examined for the purpose of recommending adjustments and changes in the engines. The statement is as follows:

Much of my work is done in advance of my visiting the plants of the Diesel engine builders from blue-prints and other memoranda which the Diesel builders send to me for my information in preparing my advice for them as to the changes and adjustments to be made on their Diesel engines in order to obtain the best results of supercharging those engines.

I have had nothing to do with the designing or in the perfection of the design of the supercharging units manufactured by Brown, Boveri & Co., Ltd.

There is also a reference to drawings and diagrams in the excerpt from Exhibit 3 above quoted but the statement in that exhibit indicates that Mr. Buchi deals directly with the engine builders and furnishes them with the drawings. That statement is:

* * * Mr. Buchi writes out the new operating data for supercharged condition, gives guarantees for the expected improvement and *furnishes to the Diesel builder*, who desires his services, the drawings, diagrams and general engineering advice for making such modifications to his engine, as Mr. Buchi considers necessary for best results. [Italics supplied.]

Counsel for the Government argued before the court that, since the record shows that the majority of sales of supercharging blowers by Brown, Boveri & Co., Ltd., for export to the United States were made in cases where Mr. Buchi's services and system were adopted, those sales establish the ordinary course of trade, citing. *United States* v. *Richard*, 15 Ct. Cust. Appls. 143, T. D. 42216; *Pleissner* v. *United States*, 16 Ct. Cust. Appls. 507, T. D. 43237; *United States* v. *Minkus*, 21 C. C. P. A. 382, T. D. 46912; *Stone & Downer* v. *United States*,

21 C. C. P. A. 479, T. D. 46958; *Goldmark* v. *United States*, 22 C. C. P. A. 358, T. D. 47378. Counsel for the importers urged that the decisions cited establish merely a method for determining the usual wholesale quantity and this court so construed the principle in *John A. Conkey & Co.* v. *United States*, Reap. Dec. No. 4229, 73 Treas. Dec. 1394. The court said at page 1400:

As we read the decisions of the appellate court in cases where sales have been made at different discounts, the court ascertained the price at which the greatest number of sales were made for the purpose of determining the *"usual* wholesale quantity"* in which the merchandise was sold.

The usual wholesale quantity in this case is not involved as the parties stipulated and agreed that the sole controversy is whether Mr. Buchi's fee for services to McIntosh & Seymour Corporation should be added to the value of the supercharging blowers.

The statement in Exhibit 3 upon which counsel for the Government relies reads:

In the majority of cases Diesel builders find it to their advantage to buy the supercharging units from Brown, Boveri & Co. and likewise to engage Mr. Buchi's services.

The above statement relates only to the majority of sales to Diesel engine builders and does not take into consideration the sales to other users of supercharging blowers. The same exhibit shows that sales of supercharging blowers are made to manufacturers of other kinds of engines or machines, as follows:

With regard to Point 1 *"Purpose of supercharging units"* we beg to enclose herewith our reference list 1308 E D F of March 1932, from which you may gather that we have manufactured and supplied superchargers not only with gas turbine drive, as used with the Buchi System, but also with Diesel drive (Figure on page 30 and No. 7 and 8 of the reference list), or electric drive, as pictured on page 32. This confirms Mr. Sidler's statement that supercharging of Diesel-engines can be carried out on different methods and is not bound to Mr. Buchi's special system.

    *       *       *       *       *       *       *

That supercharging by exhaust-gas turbine-driven blowers can also be applied to other machines than Diesel-engines is certified by the enclosed brochure "The Velox Steam Generator: a supercharged Boiler" by Ad. Meyer. In fig. 1, page 2, item 6 is the supercharging set, driven by exhaust-gas turbine. The purpose of this supercharging set, in this case, is exactly the same as in the case of supercharging a Diesel-engine. For small Velox boilers even the same patterns of supercharging units are used as for Diesel-engines. Such a supercharged Velox boiler, complete with the supercharging unit (our order 91741), has been recently supplied to the Sun Oil Company, Philadelphia (Pa.). The same Company received a few months ago another steam turbine driven supercharging set (our order 91533), by which supercharging is adopted in connection with a chemical process. These examples may confirm you that supercharging by means of exhaust-gas turbine driven blower sets is not limited to Diesel-engines, but is a universally applied method of modern engineering to increase the output of engines and boilers with internal combustion, or of chemical processes.

It is manifest, therefore, that the statement in Exhibit 3 upon which the appellant relies is not sufficient to prove that the major portion of the sales of supercharging blowers for export to the United States is to firms employing Mr. Buchi's system for the statement was made regarding the supercharging of Diesel engines only whereas the blowers are sold for supercharging other kinds of machines as well.

The case of *General Dyestuff Corp.* v. *United States*, 19 C. C. P. A. 309, T. D. 45480, cited by the appellant, involves the United States value of a coal-tar product, called "fast red salt GL" which was sold in the United States to all purchasers at a price which included a 10 per centum royalty, which royalty the importer was required to collect and transmit to the foreign exporter. In that case the merchandise was appraised at the United States value. The court held that the amount of the royalty was a part of the value because the price, at which the imported commodity was sold in the United States always included the 10 per centum addition for the royalty. The case of *United States* v. *Tide Water Oil Co.*, 19 C. C. P. A. 392, T. D. 45554, also involved an addition made by the appraiser to cover a royalty. The value of an oil refining plant was involved in that case and the purchaser agreed to pay $20,000 per year for 5 years as a license or royalty for the right to operate the plant which used a patented process for refining distillates of petroleum. Payment of the royalty accrued after the purchaser had acquired title to the machinery and had erected the plant in the United States. The court held that the royalty was not a part of the market value of the machinery and the machinery was appraised at the value thereof without the addition of the royalty.

In the case here under consideration, the McIntosh & Seymour Corporation agreed to pay 1,525 Swiss francs for services rendered by Mr. Buchi in suggesting changes in the specifications of a Diesel engine to be built by the McIntosh & Seymour Corporation. The completed Diesel engine was not imported, the shipment consisting merely of a supercharging blower to be used in connection with a Diesel engine to be manufactured in the United States. The facts in this case are similar to those in the *Tide Water Oil Co.* case, *supra*, because, like the *Tide Water Oil Co.* case, *supra*, the addition claimed by the Government to be a part of the market value accrued in the manufacture in the United States of a product in which the imported merchandise was to be used. In this case the merchandise to be manufactured is an engine, while in the *Tide Water Oil Co.* case, *supra*, the commodity to be manufactured was a distillate of petroleum. The rule adopted by the court in that case supports the correctness of the importer's claim herein.

We are of opinion that Mr. Buchi's fee for services to the McIntosh & Seymour Corporation never entered into the price at which Brown,

Boveri & Co., Ltd. offered their supercharging blowers for sale. Mr. Buchi did not design the blowers and had nothing to do with their construction. He merely recommended to his American client that a certain type of blower manufactured by Brown, Boveri & Co., Ltd. be used with the redesigned Diesel engine to be produced by the McIntosh & Seymour Corporation.

The affiant states in Exhibit 1 that the blower "was sold and shipped to the McIntosh & Seymour Corp. of Auburn, New York, at the price of Swiss Francs 4750, f. o. b. factory, at which price my firm freely offered at that time the same blower to all purchasers for exportation to the United States and other countries in the usual wholesale quantity and in the ordinary course of trade, and my firm was willing to sell at the same time and price to anyone in the home market of Switzerland, but these articles were not then, and are not now, usually sold for use in the home market but mostly for exportation." This evidence is sufficient to support the judgment of the court below.

The issue in this case was narrowed by stipulation to the question as to whether Mr. Buchi's fee for services to the McIntosh & Seymour Corporation is a part of the export value of the supercharging blowers manufactured and sold by Brown, Boveri & Co., Ltd. We find that such fee is not a part of the export value of the blowers and that the price at which they were freely offered in the principal markets of Switzerland in the usual wholesale quantities and in the ordinary course of trade to all purchasers at the time of exportation. of the merchandise in this case was 4,750 Swiss francs each, plus packing, as found by the trial judge.

We hold that appraisement should be made on the basis of export value and that such value is 4,750 Swiss francs each, plus packing. The judgment of the court below is affirmed.